## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**PAUL GUEBARA,**

      **Plaintiff,**

      **v.**                           **CASE NO.  19-3025-SAC**

**KEVEN BASCUE,  et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER
## AND ORDER TO SHOW CAUSE

Plaintiff Paul Guebara is hereby required to show good cause, in writing, to the Honorable Sam A. Crow, United States District Judge, why his claims should not be dismissed due to the deficiencies in Plaintiff's Amended Complaint that are discussed herein.

## I.  Nature of the Matter before the Court

Plaintiff brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.  Although Plaintiff is currently incarcerated at the El Dorado Correctional Facility in Oswego, Kansas, the claims giving rise to his Complaint occurred during his pretrial detention at the Finney County Jail in Garden City, Kansas ("FCJ").  The Court granted Plaintiff leave to proceed *in forma pauperis*.

The Court screened Plaintiff's original Complaint (Doc. 1) and entered a Memorandum and Order and Order to Show Cause (Doc. 7) ("MOSC") directing Plaintiff to show good cause why his non-medical claims should not be dismissed due to the deficiencies set forth in the MOSC.  The Court also granted Plaintiff an opportunity to file an amended complaint to cure the deficiencies set forth in the MOSC.  The Court ordered the officials responsible for the operation of the FCJ to prepare a *Martinez* Report regarding Plaintiff's medical claims.  The *Martinez*

1

Report has now been filed (Doc. 38) and this matter is before the Court for screening Plaintiff's Amended Complaint (Doc. 11). The Court's screening standards are set forth in detail in the Court's MOSC.

Plaintiff alleges in Count I of his Amended Complaint that after he served ten days of disciplinary segregation he was placed back in segregation without any due process or disciplinary action. Plaintiff claims his privileges were taken away and he was not allowed to mail letters, access the law library, or make phone calls while in segregation. Plaintiff alleges that his Bible was taken away and he was not allowed to have visits or to receive letters. Plaintiff attaches a grievance in which the response indicates that his privileges were suspended due to his behavior and actions. (Doc. 11–1, at 3.)

In Count II, Plaintiff alleges that he was denied medical care for his stomach illness and his Hepatitis C for two years due to the cost of treatment. Plaintiff alleges that he was denied treatment for Hepatitis C because he was told it was not an emergency. Plaintiff alleges his eye glasses were taken from him and he was required to prove they were prescription glasses. Plaintiff acknowledges that his eye glasses were returned to him. (Doc. 11, at 5.)

Plaintiff alleges in Count III that he was treated differently than other inmates in violation of due process and equal protection. Plaintiff alleges that he was treated differently because he was on lockdown for months without due process. Plaintiff attaches a grievance in which he claims he is being denied law library access while other inmates are being allowed to use it. (Doc. 11–1, at 1.) The response to the grievance indicates that the FCJ does not offer a law library to the inmates housed in the jail. *Id.*

Plaintiff names as Defendants: Keven Bascue, FCJ Sheriff; Mark Welsh, FCJ Administrator; Jeff Orebaugh, FCJ Captain; Kyle Lawson, FCJ Lieutenant; and Michelle

Newsome, FCJ Nurse.  Plaintiff seeks compensatory and punitive damages.

## II.  DISCUSSION

### 1.  Nonmedical Claims

The Court found in the MOSC that all of Plaintiff's non-medical claims were subject to dismissal for the reasons set forth in the MOSC.  The Court noted that Plaintiff's request for monetary damages based upon his First Amendment claims were subject to dismissal for failure to show a physical injury.  Plaintiff's request for compensatory damages is barred by 42 U.S.C. § 1997e(e), because Plaintiff has failed to allege a physical injury.  Section 1997e(e) provides in pertinent part that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

Plaintiff acknowledges that he was placed in segregation for disciplinary reasons. However, Plaintiff alleges a due process violation because he was returned to segregation based on his actions and behaviors without a disciplinary report.

Pretrial detainees, "may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (citations omitted).  "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime . . . [and] has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest."  *Id*. (citations omitted).  The government may "detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."  *Id*. at 536–37.

To determine when restrictions pass, as a matter of law, from constitutionally acceptable to constitutionally impermissible, a court must ask two questions.  *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013).  "First, we must ask whether an 'expressed intent to punish on the part of detention facility officials' exists" and "[i]f so, liability may attach. If not, plaintiff may still prove unconstitutional punishment by showing the restriction in question bears no reasonable relationship to any legitimate governmental objective."  *Id*. (citing *Bell*, 441 U.S. at 538–39).

"Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."  *Bell*, 441 U.S. at 540.  "[I]n addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Id*.  The Supreme Court has warned that these decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."  *Id*. at 540, n.23 (citations omitted).

Plaintiff has failed to show that his segregation was an exaggerated response or that it was done for any reason other than the effective management of the detention facility.  *See Cox v. Denning*, 652 F. App'x 687, 692 (10th Cir. 2016) (unpublished) (finding that nighttime-recreation policy for inmates in disciplinary segregation is designed to permit close monitoring

of inmates who might pose a danger to themselves, other inmates, or staff and is reasonably related to the jail's safety interest).

Plaintiff alleges discrimination and a violation of equal protection, because he was denied access to a law library.  The grievance response he attaches to his Amended Complaint states that the FCJ does not offer a law library.  Plaintiff's claim is subject to dismissal for failure to state a claim.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all person similarly situated should be treated alike."  *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.")).  Thus, Plaintiff must allege that he was treated differently than other similarly situated detainees.  "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'"  *Requena*, 893 F.3d at 1210.  Plaintiff has not shown that he was denied law library access while similarly situated detainees were granted access.

### 2. Medical Claims

Plaintiff claims that there was a delay in receiving the proper treatment for his stomach bacteria, and he was denied treatment for Hepatitis C.  The Eighth Amendment[1] guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to

---

[1]  Plaintiff alleges that he was a pretrial detainee, rather than a convicted prisoner, at the time giving rise to the allegations in his Complaint.  That distinction, however, at least with regard to Plaintiff's medical care claims, is not critical here. "Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985)).

serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted).  In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted).  A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

 "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Sealock*, 218 F.3d at 1209).  In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

The Court ordered a *Martinez* Report for Plaintiff's medical claims.  The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir.

1983)).   The Court has examined the commendably thorough *Martinez* Report and, for the reasons that follow, is considering the dismissal of this action.   Plaintiff will be given an opportunity to show cause why dismissal should not be entered.

Plaintiff alleges there was delay in receiving treatment for his stomach bacteria and that he was denied treatment for Hepatitis C while detained at the FCJ.   The *Martinez* Report states that Plaintiff was housed at the FCJ from February 26, 2015 to March 21, 2019 and provides in part that:

> When Plaintiff was booked into the Finney County jail, a medical screening form was completed. Plaintiff indicated that he had once tested positive for Tuberculosis, but reported no ongoing medical issues. (Ex. C, Medical Screen; Lawson Affd., ¶ 8).[2]
>
> During his incarceration, Plaintiff was seen repeatedly by a variety of healthcare providers for a variety of complaints and conditions. Some of this care was provided by a contract jail nurse but much of it was provided by outside providers, necessitating transporting him outside the jail to public healthcare facilities for testing, examination and treatment. (Ex. E; Lawson Affd., ¶ 8)[3]. These transports involved high risk to jailers, healthcare providers and the public because Plaintiff was a convicted murderer, facing the rest of his life in prison for a second attempted murder, had made threats of suicide and was reported to have gang affiliations. (Orebaugh Affd., ¶ 3; Lawson Affd., ¶ 3). In addition to the transports, Plaintiff was also provided medical care in the jail by the Finney County Health Department.
>
> The county incurred costs totaling $11,662.50 for medical care provided to Plaintiff. (Ex. D, Medical Bills; Lawson Affd., ¶ 8) His care generated over 700 pages of medical records from five different providers, not counting the laboratories that processed the many tests administered.   During his visits to healthcare providers, Plaintiff was free to discuss any complaint with the healthcare providers for which he wished to be examined or treated.

---

[2] The medical screening report at Exhibit C is marked "yes" to the question as to whether Plaintiff had ever had any type of TB skin test.  The question asking if he had ever had a reaction to a TB test is marked "no".  It does not appear to show a positive result.  (Doc. 38–8, at 1–2.)

[3] The *Martinez* Report provides that "[a]s can be seen by comparing the medical records provided to this list, though extensive, the list is not complete. Plaintiff was transported other times that were not recorded on this list. See Ex. X, EE, II , JJ)."

All of this care was offered and provided to Plaintiff despite the fact that he often refused offered medical care and complicated attempts to determine the cause of complaints with such actions as hunger strikes and refusing to take medication. (Orebaugh Affd., ¶¶ 4-5; Lawson Affd., ¶¶ 4-5; Ex. F, H, R, U, X, HH).

In May, 2015, Plaintiff demanded a single cell. (Ex. G; Lawson Affd., ¶ 8). When this was denied, he began making suicidal statements and started a hunger strike, stating that if he was not moved, he would claim to be suicidal to force jail staff to move him. (Ex. H; Lawson Affd., ¶ 8).

### The Stomach Bacteria

In June, 2015, Plaintiff reported stomach pain but related it to the blood pressure medication he was taking. He was advised by the nurse to take the medication with food. (Ex. I; Newsome Affd., ¶ 10). Plaintiff was transported to see healthcare providers on July 7, 2015, at which time he could talk to the healthcare providers about any issue or complaint he wished, including any stomach pain he was having. (Ex. E.)

In September, 2015 Plaintiff again reported stomach pain and, again stated that it had started when he started taking his cardiac medications. He was transported to Compass Health on September 4, 2015. Plaintiff reported that "Dr. Jack" there told him to eat a snack at night to help with the stomach pain. (Ex. GG; Newsome Affd., ¶ 10). Plaintiff was seen specifically for his stomach pain on September 17, 2015. At that time he was prescribed Omeprazole and scheduled for a follow up. (Ex. V; Newsome Affd., ¶ 11). He was again transported to the hospital to be seen for his complaints of stomach pain on September 28, 2015. (Ex. J.) At this visit, a CT scan of Plaintiff's stomach and blood work were ordered. Continued Omeprazole was prescribed for his stomach pain. (Id.) Omeprazole was provided to Plaintiff at the jail but he often refused it.  (Ex. F; Lawson Affd., ¶ 8).

The blood work showed positive for the H. Pylori antibody. But the report also noted that the result "cannot distinguish current from past infection and cannot be used to assess response therapy. Culture, breath or stool antigen tests should be used for these purposes." (Ex. L, p. 3.) On September 30, 2015, the lab results were called to Nurse Newsome and antibiotics – Amoxicillin and Clarithromycin – were prescribed. (Ex. M.) These were provided. (Ex. F.)

On October 14, 2015, Plaintiff was again transported to the hospital for the ordered CT scan.  The CT Scan was reported as showing positive for a hiatal hernia and possible gastritis but negative for mass. (Ex. CC).

Plaintiff again reported stomach pain in August of 2017. He stated that this stomach pain had started 3 weeks ago. (Ex. S; Newsome Affd. ¶ 10). A stool sample was ordered. Plaintiff initially refused to provide one. (Ex. DD). Unfortunately, when he did finally provide one, the stool sample was lost by the laboratory. Plaintiff was advised of this and asked for another sample in January, 2018. (Ex. Q; Newsome Affd., ¶ 10). Plaintiff again initially refused and did not provide the needed sample until April 12, 2018. (Ex. T; Newsome Affd., ¶ 10). When he did provide it, he stated he did not think he had bacteria. (Id.) The stool sample results were negative. (Ex. Y).

On April 30, 2018, Plaintiff was seen at Genesis for his stomach complaints. The treatment prescribed was the same drug Plaintiff had previously refused to take – Omeprazole. In addition, a CT Scan was ordered. (Ex. Z; Newsome Affd., ¶ 11). On May 31, 2018, Plaintiff was taken to Genesis to discuss the results of his CT scan and his abdominal pain. Plaintiff again chose not to take the prescribed Omeprazole. (Ex. X, Newsome Affd., ¶ 11).

After Plaintiff demanded another doctor, he was taken to Dr. Kessler on June 25, 2018.   (Ex. II). A colonoscopy was ordered. Two days later – on June 27, 2018 – Plaintiff submitted a request form demanding of the jail: "Don't order Meds." (Ex. U; Newsome Affd., ¶ 10) On September 24, 2018, the colonoscopy was performed. It showed gastritis and was otherwise normal. (Ex. BB and Ex. EE). On October 26, 2018, Plaintiff was again seen by Dr. Kessler who raised two other possibilities for Plaintiff's reports of stomach pain – the possibility of gallbladder issues and the possibility of "secondary gain", i.e. malingering. (Ex. JJ). By Plaintiff's own admission in his Complaint, he was no longer having stomach pain at this time as it had abated after the colonoscopy in September. (Doc. 1, p. 11).

On October 28, 2018, Plaintiff submitted a form to the jail nurse again stating that he was refusing the treatment that had been prescribed for his stomach pain. (Ex. HH; Newsome Affd., ¶ 10).

There is no support for the allegation that Plaintiff was diagnosed with stomach bacteria at all. The only positive test was one that expressly stated it could not be used to determine whether there was current infection or simply an indication of past infection. The follow up tests were all negative. Plaintiff himself stated that he did not believe he had bacteria.

The records conclusively and affirmatively contradict Plaintiff's allegation that he was not provided treatment for his complaints of stomach pain. The records show that his complaints were taken seriously and he was sent to multiple doctors for examination and tests of various types including CT scans and a colonoscopy. While awaiting test results, Plaintiff was offered

prophylactic treatment in the form of round of antibiotics. Some of the tests were delayed by Plaintiff himself refusing to provide a requested stool sample. A further delay was incurred by the laboratory losing the first stool sample and Plaintiff extended that delay by again refusing to provide a sample for several months. In addition, when the tests could find no explanation other than gastritis, Plaintiff was prescribed medication on multiple occasions, which he repeatedly refused.

But more importantly to the issues presented by this lawsuit, there is no support for an allegation that jail staff were deliberately indifferent to Plaintiff's stomach complaints. They repeatedly took him to multiple doctors and offered all treatment that was ordered by medical personnel.

Plaintiff's refusal to accept the treatment offered makes this case more of a case in which he is simply arguing with the medical judgment of the medical providers, which is not actionable under 42 U.S.C 1983 at all and certainly does not state a claim against the jail staff who followed medical orders.

**Hepatitis C**

Plaintiff's medical records from the KDOC show that he tested positive for Hepatitis C as early as 2003 (Ex. KK). There is no indication in Plaintiff's medical records or pleadings that he ever sought treatment for this when he was free on parole before his latest crime. When he came into the Finney County Jail in 2015, he did not report this condition. (Ex. C; Lawson Affd. ¶ 8).

Blood work done on September 28, 2015 showed that Plaintiff was "reactive" to the Hepatitis C antibody, but further noted that this only indicated exposure and "Supplemental testing recommended as clinically indicated." (Ex. L, p. 1.) There was no indication that this condition was acute or symptomatic. People can live with Hepatitis C for years without significant symptoms or serious damage. On September 30, 2015, the Finney County Health Department noted that Plaintiff's liver enzymes (AST and ALT) were "mildly elevated." On October 17, 2015, Plaintiff was seen by Matthew Byrnes at St. Catherine Hospital. Dr. Byrnes noted in the record that Plaintiff's liver enzymes were "elevated" and that he had Hepatitis C.  Dr. Byrnes prescribed no treatment. Instead he noted: "Will just monitor this for now." (Ex. O).  On November 9, 2015, Plaintiff was provided information on Hepatitis C. (Ex. FF; Newsome Affd., ¶ 10).

Two years later – in November, 2017 – Plaintiff requested treatment for Hepatitis C. But at that time, he was still not exhibiting symptoms indicating that his condition was serious or that he need[ed] immediate treatment. Blood work drawn on October 2, 2017 showed the liver enzymes to be within normal limits. (Ex. N).

On May 31, 2018, Plaintiff was seen at Genesis to discuss several of his medical issues, including his hepatitis. No medical treatment was prescribed or suggested for the hepatitis. (Ex. Y).[4]

A CT scan was conducted in September, 2018 for his abdominal pain. The physician's report of that procedure noted that Plaintiff's AST and ALT were "mildly elevated." He made no recommendation for treatment for the hepatitis. (Ex. W.)

No healthcare provider advised jail staff that the chronic condition with which Plaintiff had lived for over a decade without serious damage had become serious or required immediate treatment.   (Newsome Affd., ¶¶ 5,8; Orebaugh Affd., ¶¶ 6-7; Lawson Affd., ¶¶ 6-7).

When Plaintiff arrived at KDOC, he was provided treatment for his Hepatitis C. The latest lab reports show his AST and ALT values to be well within normal. (Ex. LL).

Jail staff are not medical care providers. Even the jail nurse cannot, within her scope of practice, diagnose or prescribe treatment. They can only provide inmates access to healthcare providers and provide the treatment ordered or recommended by those providers. Plaintiff's hepatitis was chronic and no provider recommended any thing for it other than monitoring. No provider advised that any treatment was mandated at that time. A jail is not constitutionally required to provide every treatment demanded by an inmate. This is a case in which Plaintiff simply quibbles with the medical judgement of the healthcare providers. He has no claim for unconstitutional delay in providing medical care.

(Doc. 38, at 3–9.)

Plaintiff's response to the *Martinez* Report asserts that the exhibits to the *Martinez* Report "should be suspect they could fabricate documents as selfserving."  (Doc. 45, at 1.)  Plaintiff also states that he acknowledged in his original complaint that he refused "unrequested treatment." Plaintiff disagrees with being prescribed Omeprazole.  Plaintiff states that he "has never denied the fact he refused to take medication that did NOT work or caused him painful effects." *Id*. at 2. Plaintiff states that Defendants' Exhibit F "reflects after 10-17-15 plaintiff refused all meds for a long period of time."  *Id*.  Plaintiff alleges that this was due to him being given the wrong medication and suffering a bad reaction to it.  *Id*.  Plaintiff also alleges that Dr. Byrnes prescribed

---

[4]  It appears as though the appointment may have been on May 23, 2018.

7 days of Levaquin and "the prescription was never filled."  *Id*. (citing Ex. AA).  However, Exhibit AA—which shows Dr. Byrnes' discharge summary for his stay at Saint Catherine Hospital—states "I am going to send him out on 7 days worth of Levaquin."  (Doc. 38–5, at 1.)  Exhibit  AA shows that Plaintiff was admitted to Saint Catherine Hospital on October 17, 2015 and discharged on October 19, 2015.  *Id*.  Exhibit F shows that Plaintiff refused his "1700 meds" on October 19 and "all meds" on October 21 and October 25.  (Doc. 38–13, at 2.)

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment.  *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

Plaintiff's allegations do not show a complete lack of medical care, but rather show Plaintiff's disagreement regarding the proper course of treatment or medication.  A complaint alleging that plaintiff was not given plaintiff's desired medication, but was instead given other medications, "amounts to merely a disagreement with [the doctor's] medical judgment concerning the most appropriate treatment."  *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (noting that plaintiff's allegations indicate not a lack of medical treatment, but a disagreement with the doctor's medical judgment in treating a condition with a certain medication rather than others); *Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006) (unpublished) (where appropriate non-narcotic medication was offered as an alternative to the narcotic medication prescribed prior to plaintiff's incarceration, a constitutional violation was not established even though plaintiff disagreed with the treatment decisions made by prison staff); *Carter v. Troutt*, 175 F. App'x 950 (10th Cir. 2006) (unpublished) (finding no Eighth Amendment violation by

prison doctor who refused to prescribe a certain pain medication where he prescribed other medications for the inmate who missed follow-up appointment for treatment and refused to be examined unless he was prescribed the pain medication he wanted); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist is . . . insufficient to establish a constitutional violation.").

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Plaintiff has failed to show that the delay in receiving medical treatment caused lifelong handicap, permanent loss, or considerable pain.

Plaintiff has failed to show that any defendant disregarded an excessive risk to his health or safety or that they were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference. Plaintiff has failed to show that any defendant was deliberately indifferent regarding his medication or medical treatment and his medical claims are subject to dismissal. Plaintiff's claims suggest, at most, negligence. Plaintiff should show good cause why his medical claims should not be dismissed.

## III. Response Required

Plaintiff is required to show good cause why his Amended Complaint should not be

dismissed for the reasons stated herein and in the Court's MOSC at Doc. 7.  Failure to respond by the deadline may result in dismissal of this matter without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED THAT** Plaintiff is granted until **October 26, 2020,** in which to show good cause, in writing, to the Honorable Sam A. Crow, United States District Judge, why Plaintiff's Amended Complaint should not be dismissed for the reasons stated herein and in the Court's MOSC at Doc. 7.

**IT IS SO ORDERED**.

**Dated September 30, 2020, in Topeka, Kansas.**

<u>**s/ Sam A. Crow**</u>
**Sam A. Crow**
**U.S. Senior District Judge**